FRAZIER

*v.*

CAMPBELL.

(*Supreme Court of Appeals of Virginia, Oct. 2, 1879.*)

**Infants' Contracts—Ratification after Full Age.**

Where an infant after he attains his majority ratifies, in writing, a deed made for him during his infancy, such deed is as binding upon him as if it had been made by him in proper person in the first instance, and he had been *sui juris.*

**Sale of Land—Relinquishment by Purchaser to Superior Title.**

Where it is apparent to the purchaser of a tract of land that another has title superior to that under which he claims, it is competent for such purchaser to yield possession without a judgment at law.

**Contracts—Rescission—When Not Granted.**

The application to a court of equity to rescind or cancel a contract is addressed to the sound judicial discretion of the court, and in the exercise of that discretion, the court not unfrequently refuses to rescind, when the circumstances have in the meantime so far changed that the parties cannot be restored to the position in which they stood before, or at the time of the contract.

**Same—Same—Compensation.**

In a contract of substitution when the consideration partly fails and rescission would be inequitable, the court of equity will grant relief by making compensation.

Sometime prior to 1847, James Campbell became the sole owner of a large tract of land, on which the Rockbridge Alum Springs were situated, containing about 2,300 acres. On the 14th of December, he sold to Doyle an undivided interest in the land retaining that on which the Alum Springs

were situate, and the land contiguous thereto.  On the 20th of August, 1851, James Campbell sold to Booth, Anderson and Christain, the 1,150 acres of land, being the residue of the original tract after deducting that sold to Doyle; Booth being the purchaser of one-half, and Anderson and Christian the purchasers of the other half.   In August, 1852, J. W. Frazier, the father of the appellant, bought the interest of Booth, Anderson and Christian, and subsequently sold one-fourth of this property to Wm. Frazier, and another fourth to J. T. Randolph.   These sales were ratified and approved by James Campbell, and with his consent the bonds of Anderson, Christian and Booth, which had been executed to Campbell for the deferred instalments of the purchase money were surrenderd to them, he (Campbell), receiving the bonds of John W. Frazier.   In 1853, John W. Frazier died intestate, leaving a widow and one child, James A. Frazier, a minor, who was his sole heir.   In 1859, James Campbell died, leaving two sons and two daughters, all adults, and the parties desired to have some definite arrangement in regard to the conveyance of the title.   The Fraziers and Randolphs were in full and peaceable possession of six hundred and fifty-two acres, which embraced the Alum Springs.   Doyle was in possession of the mineral lands, but the boundaries were not settled by survey.   Under these circumstances, while it was known that Campbell, under the contract with Doyle, was entitled to the excess over the six hundred and forty-two acres, which he had reserved, embracing and contiguous to the Alum Springs, yet these terms were so uncertain as to leave it doubtful, exactly where the commissioners might locate the deficiency of four hundred and ninety-eight acres.   Accordingly, on the 20th day of August, 1859, Alexander Campbell, on behalf of himself and brothers and sisters, became the purchaser, at a commissioners' sale, of all the lands, except one hundred and forty acres, which James Campbell had sold to Doyle, he also purchased

at the same time the Ailstock tract containing one hundred and ninety-nine acres, the Dunlap tract containing one hundred and sixty acres, and later the Poage tract, of one hundred and three acres, at $62.50. On the 15th of October, 1859, it was found upon a conference between the heirs of James Campbell and Wm. Frazier, acting for himself and as administrator of J. W. Frazier, and as guardian of James A. Frazier and J. T. Randolph, who were the equitable owners of the Alum Spring tract, that the convenience of all parties would be promoted by a modification of the original contract. As stated before, the Fraziers were in peaceable possession of the Alum Spring tract of six hundred and fifty-two acres, and they were also entitled to their father's quantity of the four hundred and ninety-eight acres, to be laid off at the southwestern end of the survey adjoining the John Barclay survey of twenty thousand acres. The land laid off in this part of the survey would be remote from the Alum Spring tract, while it would be convenient to the rest of the tract which had been sold to Doyle, and subsequently bought by the Campbells. The Campbells therefore proposed to the Fraziers, that instead of laying off to them the four hundred and ninety-eight acres, of that part of the tract as contemplated in the original contract, they would convey to them, in lieu of the four hundred and ninety-eight acres, the Poage tract of one hundred and three acres, the Ailstock tract, of one hundred and ninety-nine acres, and the Dunlap tract of one hundred and fifty-eight acres, making an aggregate of four hundred and sixty acres, which was to be accepted by them instead of the four hundred and ninety-eight acres. The Fraziers promptly acceped this proposition, which was reduced to writing, and signed by Wm. Frazier, Porter and Randolph. As James Frazier was an infant, the agreement was made subject to his ratification after he became of full age. A deed was prepared by the Campbells which was approved by

the grantee, and placed as an escrow in the possession of Jos. G. Steele to be by him delivered, when the purchase money was fully paid. The Fraziers were at once put into possession of these tracts, and remained in possession, except the Poage tract, up to the time of this suit. James A. Frazier, after he attained his full age, solemnly, by matter of record, ratified this change of contract. In 1870, Mr. George Randolph, of Philadelphia, claimed that he was the owner of the Poage tract, by a prior patent, and upon investigation this was found to be true, and James A. Frazier, without waiting the results of litigation yielded to the claim of Geo. Randolph, and surrendered the possession of the Poage tract. James A. Frazier, while in possession of the Poage tract, cut a large quantity of timber. He had also paid a large amount of the purchase price, but after the relinquishment of the Poage tract, he stopped paying, and in 1875, Alex. D. Campbell filed his petition representing that there was a large amount of the purchase money due from the Fraziers to his father's estate, and asking a decree for its payment. James A. Frazier answered the petition, and set forth a claim to compensation for alleged defects in the title to various portions of the land, which he contended, gave him a claim to damages, which would extinguish the petitioner's whole claim. The cause was referred to a commissioner, who reported in favor of the appellee, James Campbell's administrator, and the court entered a decree accordingly, from which decree, the appellant, James A. Frazier, appealed, and the appellate court confirmed the decree.

Appeal from circuit court of Augusta.

*Sheffy & Bumgardner*, for appellant.

*A. H. Stuart*, for appellees.

BURKS, J., delivered the opinion of the court.

The principles involved in this cause, arising upon the petition of the appellant, and the answer of the appellee, in the circuit court were settled by the decree of that court pronounced on the 20th day of November, 1876.

That decree decides :  1st.  That the contract of substitution, of the 15th of October, 1859, and the deed made in pursuance thereof on the 14th of September, 1860, and now deposited with Jos. G. Steele, as an escrow, having been long acquiesced in by James A. Frazier, after attaining his majority, and having been confirmed, ratified and accepted by him, by solemn act of record, in his bill for partition in one of these cases, cannot now be repudiated and discovered by him, but must be and is hereby adjudged to be firm, stable and binding upon him, and all the other parties thereto.

2nd.  That it appearing that the title of James A. Frazier to the Poage tract was inferior to that of the persons claiming under the Grubb patent or Cope survey, the said Frazier was justified in surrendering the same without awaiting a final judgment at law.

3rd.  That, although the title to the Poage tract has failed by claim of paramount title in another, James A. Frazier is not, under all the circumstances of the cause, entitled to rescission of the contract of substitution of October 15th, 1859, said Frazier having confirmed and accepted the deed of September 24th, 1860, which gives effect to that contract, and having for seven or eight years, since attaining his majority, and for a long time after the defect in the title to the Poage tract was known to him, continued in the use, occupation and possession of the Dunlap and Ailstock tracts, cutting large quantities of timber from those tracts, so that it would be impossible now to place the parties in statu quo, as they stood at the date of the contract, were the court now to decree a rescission of the same.

4th.    That the true measure of compensation to James A. Frazier for the loss of the Poage tract by paramount title, is the value of the tract as of the 15th day of October, 1859, the date of the contract of substitution to be ascertained, as of that date, and credited as of that date upon the amount then due upon the two bonds of John W. Frazier and others, returned with Commissioner Kinney's report.

The court is of opinion that there is no error in this decree of the circuit court.

1. Although at the date of the contract of substitution and of the deed pursuant thereto, made and entered into on behalf of the appellant, he was a minor, yet after attaining full age, in the bill filed by him and Porter and wife, he expressly and distinctly ratified said deed and said contract in the following language :    "On the 14th day of September, 1860, the heirs of said James Campbell made a conveyance, which your orator understood is now on deposit with James G. Steele of Rockbridge, as an escrow to be delivered when the purchase money shall all have been paid, by which they convey to your orator, James A. Frazier, six hundred and fifty-two acres of land originally agreed to be conveyed by James Campbell as aforesaid, embracing the Rockbridge Alum Springs and its improvements, and sundry other tracts mentioned in said deed, and amounting in quantity and quality to about the number of acres originally agreed to be sold by the said James Campbell, with the consent of Wm. Frazier, John T. Randolph and Stephen A. Porter, the husband of the widow of John W. Frazier, in full discharge of the said contract of the said James Campbell, deceased, provided your orator, James A. Frazier, then a minor, shall ratify the said arrangement at his arrival at full age, and your orator does hereby ratify and confirm the same, and doth accept the said deed of the 14th of Sep-

.tember, 1860. A copy of said deed is herewith filed marked "M."

This deliberate act of the appellant made the deed of the 14th of September, 1860, as obligatory upon him as if it had been formerly and solemnly executed by him in proper person in the first instance, and he had then been sui juris. Besides this express ratification, there was subsequent acquiescence for several years. Mere acquiescence without anything else is not generally sufficient evidence of a promise, but any ratification or affirmance of a clear and equivocal character, showing an intention to affirm the deed is enough. Ervine v. Ervine, 9 Wall. 617. The question of disaffirmance is considered and discussed in the opinion of the court delivered by Judge Moncure in Mustard v. Wohlford's heirs, 15 Gratt. 329.

2. There is no doubt that Randolph had a paramount title to the Poage tract of land, and it was therefore competent for the appellant to surrender possession to him without awaiting eviction by judgment at law. Merryman v. Bourne, 9 Wall. 592.

3. This is not a case for the rescission of the contract. The application to a court of equity to rescind or cancel contracts for lands, like that for their specific execution, is addressed to the sound judicial discretion of the court ; and in the exercise of that discretion, the court not unfrequently refuses to rescind, when it would also refuse to decree the contract to be performed. 2 Minor's Inst. 811. The rule being, that he who seeks equity must do equity in matters. arising out of the transaction in respect of which he seeks relief, the court will not rescind a transaction, unless the party against whom relief is sought can be remitted to the position in which he stood antecedently to or at the time of the transaction. The court proceeds on the ground that as the transaction never ought to have taken place, the

rights of the parties are, as far as possible, to be placed in the same situation in which they would have stood if there never had been any such transaction.

A contract cannot be rescinded, if the circumstances have in the meantime so far changed that the parties cannot be restored to the position in which they stood before or at the time of the contract. Kerr on Fraud and Mistake, 328, 334, 335.

Manifestly the returning to the Campbell heirs of the Ailstock and Dunlop tracts of land, stripped as they have been, since the deed of September, 1860, of their timber, which alone rendered them of any value, would not be a restoration of the former status.

4. Rescission being properly denied, and the appellant being without adequate remedy at law, equity will grant relief by making compensation. The standard adopted by the court by which the loss should be measured, namely, the value of the Poage tract as of the 15th of October, 1859, the date of the contract of substitution, is, in our opinion, the correct one under the circumstances. It is impossible to determine with any decree of certainty where the four hundred and ninety-eight acres, the deficiency in the quantity of land originally contracted to be sold, are located. It cannot be ascertained from the written contract of 1847 between Campbell and Doyle, nor from the contracts between Campbell and the Fraziers, nor from the contract and deed of substitution, nor from any papers or documents or other evidence in the case. It is very clear, that when the contract of substitution was entered into, the heirs of Campbell were in a condition to make up the deficiency either out of the moiety of the original tract sold to Doyle, or the moiety retained by their father, or out of both, as might be proper, the heirs having by purchase acquired Doyle's interest. But the

precise location of the four hundred and ninety-eight acres, would seem to be not very material in this controversy, for it is plain that the value of the substituted tracts, under the agreement among the parties, measures the value of the four hundred and ninety-eight acres, and as the appellant retains two of the tracts, the loss will be measured by the value of the Poage tract, of which he was evicted.

What that value is, or rather was, at the date of the contract of substitution October, 15th, 1859, is matter of fact, and is the only question of much difficulty in this case. It was not settled by the decree already referred to, but was reserved, and was finally determined by the decree appealed from, which was rendered on the 18th day of June, 1877.

On the several references to a commissioner for enquiry as to the value, many witnesses were examined and there was great diversity of opinion among them, the estimates varying from twenty-five cents to $25.00 per acre. Of the sixteen witnesses examined, for the appellee, one only put the value as high as $4.00 per acre. Some of the others put it at $2.00 per acre, others at $1.00 and the others at less. The average is between $1.00 and $2.00 per acre. Three witnesses only on the part of the appellant fixed a value. Two of these were the appellant himself, and Mr. Wm. Frazier, and the other a Mr. Withrow. The last named thought the timber on the land was worth $1,500.00 or rather he said he would give that sum for it. The estimates of the Fraziers were with reference to the land, as an appendage to the Alum Springs. An examination of the depositions will show that the estimates of these gentlemen were more or less speculative. Mr. Wm. Frazier says he was influenced in the acquisition of the land by its value, and use as an appendage to the Springs. One of the elements in his estimate was the timber on the land. Another was the spring upon it, and the use he proposed to make of it. He considered it a splen-

did fountain, and to spring-goers, with nothing to do, it would repay them (with a good road) to ride to see it, and it was one of his plans to erect a bathing establishment there, etc.   He admits, however, that these latter uses might be regarded as purely speculative, as they really were, for the land was about four miles distant from the Springs by a road leading over a mountain.   He was very unwilling to fix any monied value on the land, but finally said that considering the difficulty at this day of attempting to assign a value in money to what he did not in October, 1859, attempt to estimate, he thought he might safely say, that he could then have estimated the failure to secure the advantages offered by the acquisition of the Bubbling Spring tract (which is the same as the Poage tract) as an appendage to the spring, as some two thousand dollars.   Commissioner Kinney, after the estimate of the witness Withrow, reported that in his opinion $1,500.00 would be a fair and equitable compensation to the appellant for the loss of the land as an appendage to the Alum Springs.   Commissioner Waddell, to whom Kinney's report, with the exceptions' was referred, concurred with Kinney in his estimate of $1,500.00 as the value of the land considered as an appendage to the springs and further fixed the intrinsic value of the land at $1,000.00.   Now, evidently these commissioners, perplexed, as their reports show them to have been, by the conflicting character of testimony, paid but little regard to the estimates of value given by the numerous witnesses of the appellee, and the circuit court not being satisfied with the conclusions reached by the commissioners, "and not being advised of the proper decree in the premises," recommitted Mr. Waddell's report to him, with directions to consider the exceptions, and revise and remodel the report, as he might be advised from the evidence then in the case, and such as might thereafter be taken by the parties, and further directs him to select two or more impartial and unprejudiced persons, who should go upon the land in contro-

versy, and, upon a view, estimate the value thereof upon the
15th day of October, 1859, and whether the land has any par-
ticular value as an appendage to the Rockbridge Alum Springs
property, and what other timber lands could be procured
equally accessible to said property.    Pursuant to this order
the commissioner selected William Wilson, John D. Sterrett
and D. F. Mohler, and states in his report, that they "were se-
lected, because of their intelligence, impartiality and peculiar
fitness for the duty required."    These gentlemen went upon
the land, two of them in company with the appellant and
appellee, and the other one in company with the appellee on
the following day, and after examining the land, they ap-
peared before the commissioner and gave their depositions,
the counsel on both sides being notified but neither appear-
ing.    The three witnesses concurred in the opinion, that the
land has no special value as an appendage to the Springs
property, and that they had no knowledge of what other
timbered lands, if any, can be procured equally accessible to
said property.    Wilson and Sterrett value the land as of the
15th of October, 1859, at one dollar per acre, and Mohler at
ninety cents per acre and the commissioner reported that the
testimony of these witnesses under all the circumstances,
was conclusive of the matter in controversy.    Thereupon
the circuit court pronounced the decree appealed from, and
after reciting that Messrs. Wilson and Mohler, from their res-
idence and occupation in life, were peculiarly well qualified to
judge of the value of the land as to which they testified, and
John D. Sterrett, the third commissioner, being a man of
recognized intelligence and integrity, and also well acquainted
with the value of such land, in the judgment of the court,
great weight was due to their opinions and report, and that
the commissioner in connection with the other evidence in
the cause, very properly adopted it as the basis of his report,
confirms Commissioner Waddell's second report by which the

value of the land was fixed at $103.00, and that amount deducted from the bond of the appellant.

Although this opinion is already at greater length than was anticipated at its commencement, we deem it proper to give some extracts from the depositions of these witnesses, because of their important bearing on the case.

Mr. Wilson, after stating that he and Sterrett, went on the land, and that the appellant and appellee met them, and showed them the lines, corners and line trees, about which there was no disagreement, says, "We went through the tract, and examined it thoroughly. This tract, which is known, as the Bubbling Spring or Poage tract, lies in the mountains, or, rather between two hills, which are parts or spurs of the mountains, and forms a little valley, with the Bubbling Spring, between the middle of the tract and the upper end. This is a very beautiful spring, and a bold stream flows from it through the remainder of the land. The quality of the land is rather better than ordinary mountain land. A portion of the tract is considerably better, say two-thirds, but the remainder is very inferior. The average, however, is somewhat better than ordinary mountain land. For agricultural purposes, my opinion is that the land will not pay for its cultivation.

"The tract is tolerably well timbered for mountain land. The timber consists of oak, some few poplars, a few large white pines, and a very few locust; the balance is undergrowth, scrub oaks and dwarf pines. Most of the white oak timber would be suitable for railroad ties, but is hardly large enough for saw timber. I think the whole tract would not, in 1859, have furnished more than seven hundred to one thousand hewed ties, which at that time, standing in the woods, were worth about four cents each. About that time, I was engaged in the tie business, and both bought and sold ties, about the same distance from

the railroad. There is no great deal of any other kind of oak timber, and what there is has no special value. There are a few poplar trees very suitable for saw timber, but I doubt if it would have paid expenses to get it out from that place. There are not many white pines, but what there are are good and suitable for shingles. These trees would furnish possibly 30,000 shingles, worth in 1859, in the woods, not more than fifty cents per one thousand. The few locust trees would furnish some posts. I can't say how many.

"I can not see how this tract has any special value as an appendage to the Rockbridge Alum Springs property. There is no way of getting to it from the Springs except by crossing a mountain. The only road practicable for vehicles is circuitous, and the distance some three or four miles. It is also over the mountain. A nearer way, but a mere path, we were informed, leads directly across the mountain. On account of the distance, etc., from the Springs, the tract could not be specially valuable to the Springs as a place from which to obtain firewood. A large amount of firewood might be obtained, but I don't think it would pay to get it out.

"There is a good road from the tract to the railroad, some three or four miles, but in 1859, and since, there has been no demand for firewood on the railroad to justify the cost of obtaining it from this tract.

"As to any other especial value of the tract as an appendage to the Springs, the idea of making a bathing place there, and a fishing place, etc., we took them all in consideration, and my judgment is that the proprietor would never be repaid the costs of making such improvements and keeping them up."

Sterrett concurred in Wilson's testimony in every particular.

Mohler examined the land in company with the appellee, the day after it was examined by Wilson and Sterrett. He

is a native of Augusta county, where he says he has resided all his life except that during small periods of the last twenty years he lived in the counties of Rockingham and Rockbridge. For about fifteen months in 1868 or 1869, he lived in Rockbridge, four miles from Goshen, and some fifteen miles from the Bubbling Spring or Poage tract of land, and for the last twenty-one years he has been running a steam saw mill and engaged in the lumber business.

After speaking of his examination of the land, he says: "I am satisfied that I saw the whole tract. There is not and has not been for years, or, indeed, ever, any saw timber there in sufficient quantity to justify the expense of getting it out. It would be preposterous to take a saw mill there to get out the small quantity of good saw timber on the land. In my judgment there is white pine enough to make 20,000 shingles, and white oak enough to make from 4,000 to 5,000 tight barrel staves. The remainder of the timber suitable for railroad ties would yield probably a thousand ties and no more. There is a larger yield of ties than the land would have afforded fifteen or twenty years ago, owing to the growth and improvement of the trees. My belief is that the timber is much better now than it was fifteen or twenty years ago. I consider the whole value of the tract of land consists in the value of the shingles, barrel and tie timber found on it. I think the value of these kinds of lumber per thousand is about what it was twenty years ago, viz. : shingles about seventy-five cents per thousand, barrel staves about $2.00 per thousand and railroad ties five cents (5c.) each. The land of this tract is not worth anything for agricultural purposes—it is not worth fencing. Mr. Randolph, the owner of the tract, had put up a summer residence on the tract at considerable expense, but the whole property with its present improvements, can have no great value to any one except a rich man, who can afford to indulge in such a place of resort.

"The spring is large and attractive, but the water is not cold. I can't see that the tract has any special value as an appendage to the Rockbridge Alum Springs property. It is too far to haul firewood, with a mountain to cross. I don't see how the tract could profitably be made a bathing or fishing place in connection with the Springs."

We have omitted to state a fact appearing in the record, which is deemed of some importance in determining the value of this Bubbling Spring or Poage tract of land. It was purchased by the appellee, Campbell, on the 7th day of September, 1859 (a little more than a month before the contract of substitution was entered into), at a public sale under a decree of the court. The sale was made in front of the hotel, at the Rockbridge Alum Springs, by public auction, after advertisement in the county newspaper and by hand bills, and, as Campbell testifies, in the presence of Mr. Wm. Frazier. This statement is contained in what is called "the replication" of Campbell to the appellant's petition, which is referred to in Campbell's deposition and made a part of it. The price at which it was purchased was sixty-two dollars and fifty cents for the tract. Campbell says that he thought he paid its value when he bought it, but that he might have given a dollar an acre, if he could not have bought it for less, that he did not think he would have given any more than one dollar per acre at that time.

Upon the whole case, we are of opinion that there is no error in the decree complained of, and that it should be affirmed.